IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 7, 2011

## TIMOTHY GARVIN ODOM v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Hardeman County**
**No. 07-01-0494       J. Weber McCraw, Judge**

---

**No. W2011-00448-CCA-R3-PC  - Filed November 21, 2011**

---

The petitioner, Timothy Garvin Odom, appeals the denial of his petition for post-conviction relief from his conviction for rape of a child. On appeal, he argues that the trial court erred in denying his petition because he received the ineffective assistance of counsel. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JEFFREY S. BIVINS, JJ., joined.

Clifford K. McGown, Jr., Waverly, Tennessee (on appeal); Gary F. Antrican, District Public Defender; and Shana Johnson, Assistant Public Defender (at trial and of counsel on appeal), for the appellant, Timothy Garvin Odom.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and Joe L. VanDyke, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was convicted of rape of a child by a Hardeman County Circuit Court jury and was sentenced to eighteen years in the Department of Correction. On direct appeal, this court affirmed his conviction and sentence, and the Tennessee Supreme Court denied his application for permission to appeal. See State v. Timothy Garvin Odom, No. W2008-00795-CCA-R3-CD, 2009 WL 2998923 (Tenn. Crim. App. Sept. 21, 2009), perm. to appeal denied (Tenn. Mar. 15, 2010). The underlying facts of the case were recited by this court

on direct appeal as follows:

Investigator Mike Kennamore, with the Hardeman County Sheriff's Department, testified that he was contacted by the Department of Children's Services on April 26, 2007, concerning a complaint made by the victim, E.D., who was eleven years old. (The minor victim will be referred to by her initials). E.D. was interviewed at the Carl Perkins Center, and Investigator Kennamore watched the interview in a separate room via a closed circuit television. Investigator Kennamore said that the victim ran "through a range of emotions" during the interview. Initially, E.D. was "closed up," looking down, and then she began to open up as the interviewer continued to talk. Investigator Kennamore said that E.D. at that point became upset and was embarrassed. During the interview, the victim eventually said that [the petitioner] had penetrated her vaginally with his penis. A warrant for [the petitioner]'s arrest was issued, and it was discovered that [the petitioner] had left Hardeman County.

Investigator Kennamore received information that [the petitioner] was residing in Forrest, Mississippi. On June 20, 2007, [the petitioner] was arrested in Mississippi and transported back to Tennessee. Investigator Kennamore stated that he interviewed [the petitioner] at the Hardeman County Sheriff's Department on June 21, 2007. [The petitioner] was read his Miranda rights, indicated he understood his right not to continue with the interview, and executed a written waiver of those rights. Investigator Kennamore said that he and [the petitioner] conversed for awhile, and then [the petitioner] gave a written statement concerning E.D.'s allegations. The statement was introduced as an exhibit at trial and read to the jury. In his statement, [the petitioner] acknowledged that he knew the victim and that he had had sexual contact with her. In his statement, [the petitioner] said that the victim had been flirting with the boys in the neighborhood. [The petitioner] explained:

> I said I was going to tell on her to her mother, and she said, "No, don't do that." I think I said yes because [the victim's mother] needs to know how she had been conducting herself with them boys and all. She kind of got whiney, saying "don't tell." I was pretty well wasted that day. She shoved me down on the bed. If I remember correctly, she was unbuttoning her pants. She pulled my shorts down-when I say shorts, I mean boxers. She got on top of me and she started rubbing, bumping, grinding or whatever you want to call it. I finally pushed her

-2-

off of me. I stood up and put my shorts on. I told myself, "I need to get out of this mess," and I left.

When asked whether his penis had penetrated the victim's vagina, [the petitioner] responded, "It felt real warm but it never did go in." [The petitioner] said that he had drunk one and one-half forty-ounce bottles of beer. [The petitioner] stated that the incident occurred in his bedroom, and he said that the victim was twelve years old.

On cross-examination, Investigator Kennamore acknowledged that [the petitioner] cooperated with the investigation. Investigator Kennamore stated that the victim did not give a specific date in March as to when the incident occurred, and he acknowledge[d] that the offense could have been committed in late February. Investigator Kennamore acknowledged that E.D. was not examined by a physician, but he believed that a medical examination would not have revealed any evidence pertinent to the case.

E.D. testified that she lived in a three bedroom house with her mother, Geneva Denney, and three brothers, Nathan, John-John, and Eric. E.D. said that [the petitioner] also lived with the family at the time of the offense. E.D. stated that Eric and John-John shared a bedroom, Nathan slept on the couch, she shared a room with her mother, and [the petitioner] slept in the third bedroom. On the night of the offense, E.D., one of her brothers, and [the petitioner] were watching a movie in [the petitioner]'s bedroom from [the petitioner]'s bed. E.D. said she was dressed in jeans and a shirt, and [the petitioner] was wearing boxer shorts. At some point, E.D.'s brother left [the petitioner]'s bedroom. E.D. stated that she fell asleep during the movie. E.D. said that [the petitioner] then removed her clothes and penetrated her in her "private part" with his "private part." E.D. said that the incident lasted between ten and twenty minutes. [The petitioner] told E.D., "Don't tell your mama or you're not going to have nowhere else to live." E.D. acknowledged that [the petitioner] paid some of the family's bills.

E.D. said that she told her mother about the incident some time later. Ms. Denney confronted [the petitioner] and told him that she was going to call the sheriff's department, and [the petitioner] "ran out the door." E.D. stated that she was eleven years old at the time of the offense.

On cross-examination, E.D. said that her brothers asked her mother if [the petitioner] could live with them, and Ms. Denney agreed. E.D. stated that

her mother felt sorry for [the petitioner] because he had cancer. E.D. said that the incident occurred at approximately 10:00 p.m. on a weekday night. E.D.'s brother, Nathan, was supposed to stay with E.D. while her mother went to pick up her other brothers from work, but Nathan went over to his uncle's house and left E.D. alone with [the petitioner].

E.D. said that after the incident, [the petitioner]'s son and daughter-in-law, Kevin and Alisha Odom, came to live with them. E.D. told Ms. Odom about the incident after [the petitioner] complained to Ms. Denney about E.D.'s failure to do her homework. Ms. Odom told Ms. Denney that E.D. had something to tell her, and E.D. then told Ms. Denney.

Ms. Denney testified that she met [the petitioner] while she was living with her mother in Byhalia, Mississippi. Ms. Denney's sons, John and Nathan, became friends with [the petitioner] who lived two doors down from the Denneys. Ms. Denney said that [the petitioner] was divorced and had cancer at the time. When Ms. Denney decided to move to Tennessee, her sons asked her if [the petitioner] could come with them. Ms. Denney said that she did not have a job at the time, and [the petitioner]'s disability check would cover the family's bills, so she agreed. Ms. Denney said that she never had a romantic relationship with [the petitioner].

Ms. Denney said that Kevin and Alisha Odom arrived at the house. Ms. Denney was in her bedroom when they rushed in and told her to listen to what E.D. had to say. Ms. Denney immediately confronted [the petitioner] about the incident. [The petitioner] responded, "Geneva, do you think I would do something like that?" Ms. Denney told [the petitioner] she was going to call 911 and the sheriff's department. [The petitioner] ran out of the house, jumped into his truck, and left. Ms. Denney said that Kevin Odom actually reported the incident to the sheriff's department. Ms. Denney explained that her oldest daughter "was done the same way by a former boyfriend's friend." Ms. Denney stated:

> I went all the way, and his daddy was the Sheriff. He ran. They never prosecuted or nothing. They just let it go. It just went through the system, and I figured it would do the same with [E.D.] so I didn't push.

The State rested its case-in-chief, and [the petitioner] put on his

-4-

defense. [The petitioner] testified that he was fifty-two years old, that his cancer was in remission, and he suffered from depression. [The petitioner] said that he had been receiving social security benefits for approximately five years because he was unable to work. [The petitioner] stated that he paid some of Ms. Denney's bills in exchange for room and board. [The petitioner] considered Ms. Denney a close friend. [The petitioner] described his relationship with his son as "poor" because Kevin Odom had a drug problem. [The petitioner] stated that he tried to be like a grandfather to Ms. Denney's children. [The petitioner] said, "I just love them to death, you know." [The petitioner] said that his heart was broken over E.D.'s allegations, but he "still care[d] for them very deeply."

[The petitioner] said that in addition to Ms. Denney and her four children, Kevin and Alisha Odom and their baby, and [the petitioner]'s four grandchildren also lived in the house. [The petitioner] stated the incident occurred on a Sunday between approximately 5:00 p.m. and 5:30 p.m. and that everybody was at home. [The petitioner] said that E.D. was mad at him that Sunday because he had admonished her when E.D. "flashed" the young man across the street. [The petitioner] said that E.D. pushed [the petitioner] down on his bed and began striking and kicking him. [The petitioner] pushed E.D. off the bed on to the floor. [The petitioner] denied that there was any sexual contact between him and E.D. [The petitioner] said that he was weak from his chemotherapy, and E.D. was taller than [the petitioner] and weighed more.

[The petitioner] said that his son came into the bedroom and then Ms. Denney. Kevin Odom threatened to beat up [the petitioner], and [the petitioner] told them he would go to his sister's house in Mississippi until "everybody cools down." [The petitioner] said that he was scared of his son. [The petitioner] did not recollect Ms. Denney asking him if he had touched E.D. [The petitioner] said that he exchanged a few letters with Ms. Denney while he was in Mississippi, and [the petitioner]'s sister talked to Ms. Denney by telephone.

[The petitioner] said that his statement to Investigator Kennamore concerning his sexual contact with E.D. was untrue. [The petitioner] stated that Investigator Kennamore "was pretty rough," and "got in [his] face real hard." [The petitioner] denied that he initiated any sexual contact with E.D.

On cross-examination, [the petitioner] acknowledged that he did not say that E.D. slapped or struck him in his statement to Investigator

-5-

Kennamore. [The petitioner] denied that E.D. pulled down his boxers or that he had any type of sexual contact with her. [The petitioner] acknowledged that he knew he had been charged with rape of a child at the time that he gave his statement, but stated that he did not know the length of his potential sentence until later. [The petitioner] said that he last underwent chemotherapy approximately one year before the incident.

The State called as a rebuttal witness Angela Anders, a correctional officer with the Hardeman County Sheriff's Department. On June 21, 2007, Investigator Kennamore asked Officer Anders to step into the interview room and read [the petitioner]'s statement to him because [the petitioner] did not have his glasses with him. Officer Anders read the statement to [the petitioner], and then she signed the statement along with [the petitioner] and the investigating officers.

Id. at *1-4.

On July 12, 2010, the petitioner filed a timely *pro se* petition for post-conviction relief. Counsel was appointed, and no amended petition for post-conviction relief was filed. In his petition, the petitioner raised a number of allegations of ineffective assistance of counsel. The post-conviction court conducted an evidentiary hearing, at which the petitioner testified that he retained counsel to represent him in his rape of a child case.[1] He believed that, at that time, his poor mental and physical states could have played a role in the defense of his case. He explained that he was diagnosed with colon cancer in September 2002 and had gone through three surgeries and a two-year regimen of radiation and chemotherapy. One of the side effects of his colon cancer treatment was impotence. As a result of the financial toll of cancer on their marriage and his impotence, his wife of thirty years left him in April 2004. The petitioner's grandchild also died, and the petitioner started self-medicating with "alcohol and pills."

The petitioner testified that counsel visited him in jail in October 2007 and informed him of a plea offer for ten years at 100%. Counsel advised the petitioner that it would be in his best interest to accept the plea. Counsel also advised the petitioner that it would be very difficult to prevail at trial given the nature of the charge.

The petitioner testified that he discussed his physical and mental issues with counsel, and he believed that counsel obtained his medical records. However, he did not have a psychosexual evaluation prior to trial. The petitioner believed that had counsel based his

---

[1] We will limit the majority of our factual recitation to the testimony relevant in this appeal.

defense on the petitioner's sexual inabilities, the outcome of his trial would have been different. The petitioner did not recall ever discussing with counsel the possibility of using his ex-wife as a potential witness. The petitioner and counsel never discussed the possibility of having a medical expert testify to the effects of cancer and radiation on one's sexual abilities.

On cross-examination, the petitioner acknowledged that he did not have knowledge of all of counsel's investigative activities prior to trial because he was incarcerated. He admitted that it was brought before the jury that he was a cancer survivor and that one of the reasons the victim's family took him in was because he had had cancer. The petitioner denied raping the victim. He could not recall whether he testified about his impotence at trial and acknowledged that he could have told the jury whatever he wanted it to hear when he testified. The petitioner said that his statement to the investigator was not correct or voluntarily given.

Trial counsel testified that he had practiced law for thirty-five years and exclusively handled criminal cases. Counsel said that, over the course of his representation, he visited the petitioner in jail five or six times in addition to the times they met in court. Counsel found the petitioner to be a "personable, cooperative person." Counsel obtained the petitioner's work and medical history and informed the State of the petitioner's medical problems with the hope the State would "take that into consideration." Counsel noted that everyone was aware that the petitioner had had cancer, undergone treatment, and was not in the best of health. Although the petitioner "was having serious problems dealing with the situation," counsel believed that he understood everything they discussed and their "communication was very easy."

Trial counsel testified that he knew about the petitioner's alcoholism and drug use, but he was not informed by the petitioner about his being impotent. Counsel said that he "c[ould]n't investigate what [he] d[id]n't know about and . . . [the petitioner] never told [him] that, never told the investigators . . ., never mentioned it in his testimony in the motion to suppress, never mentioned it in his trial testimony." He noted that he "would have certainly made that of evidentiary use for what it was worth," although he considered it to be "an imperfect defense."

Trial counsel testified that the petitioner received a ten-year offer, and counsel recommended that he take it. Counsel thought that the petitioner's case was one that "didn't need to go to trial," but the petitioner declined the State's offer.

On cross-examination, trial counsel reiterated that the petitioner's medical condition was never in controversy, therefore, there was no reason to admit his medical records at trial.

Counsel said that the petitioner never discussed the possibility of using his ex-wife as a witness to his impotence and, because counsel did not know about the petitioner's impotence, he would not have known "to call her to verify that fact." Counsel stated that none of the petitioner's problems with anxiety over the situation rose "to the level of asking for a medical or a mental examination."

Trial counsel testified that, because the victim was eleven years old at the time of the offense, he felt that a motion for a hearing regarding her prior sexual history would have been "frivolous" and not legally supportable "because she's incapable of giving consent." Counsel said that he thought it was to the petitioner's advantage that the victim did not undergo a forensic examination. Counsel brought it out at trial that there was a delay between when the offense occurred and when the victim told her mother. He believed that the delay went against the victim's credibility. Counsel said that he had extensive negotiations with the State and managed to have the charge reduced from a Class A felony to a Class B felony, but the petitioner did not want to accept the State's offer.

The post-conviction court filed a written order denying the petition on February 1, 2011. The court noted that the petitioner's "major point of contention" was that trial counsel's failure to promote the defense of the petitioner's impotency led to his conviction. However, the court noted that the petitioner presented no proof, in the form of medical proof or testimony of his ex-wife who was evidently aware of his condition, at the evidentiary hearing. The court also accredited the testimony of trial counsel that the petitioner had not told him that he was impotent.

**ANALYSIS**

On appeal, the petitioner argues that the post-conviction court erred in finding that he received effective assistance of counsel. He asserts that his impotence was a defense to the charge against him and, had trial counsel offered evidence of his impotence, the result of the proceeding would have been different.

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Id. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the trial court's findings as to the credibility of witnesses or the weight of their

testimony. Id. However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. See U.S. Const. Amend. VI; Tenn. Const. art. I, § 9. To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The same principles apply in determining the effectiveness of trial and appellate counsel. Campbell v. State, 904 S.W.2d 594, 596

(Tenn. 1995).

After review, we conclude that the petitioner has failed to prove that trial counsel performed deficiently or that any deficiency caused him prejudice. The petitioner asserts in his brief, "that he discussed his sexual problems resulting from the colon cancer . . . is uncontroverted," and his medical records were not offered into evidence. However, the petitioner only testified that he discussed his "health" and "physical" problems with trial counsel; he never specifically testified that he discussed his impotence with counsel. Also, contrary to the petitioner's assertion, trial counsel testified that the petitioner did not inform him of the petitioner's impotency, or counsel said he would have utilized such as a defense to the best of his abilities. Trial counsel also testified that he did not introduce the petitioner's medical records because the petitioner's medical condition was never in controversy. The post-conviction court explicitly accredited the testimony of trial counsel. Thus, the petitioner has failed to prove that trial counsel rendered deficient performance.

The petitioner additionally asserts that his ex-wife would have been able to testify at trial concerning his impotency; however, the petitioner testified at the evidentiary hearing that he never discussed with trial counsel the possibility of using his ex-wife as a witness. Likewise, counsel testified the petitioner never discussed the possibility of using his ex-wife as a witness to his impotence and elaborated that, because counsel did not know about the petitioner's impotence, he would not have known "to call [the petitioner's ex-wife] to verify that fact." Again, the petitioner has failed to prove that trial counsel rendered deficient performance.

Furthermore, the petitioner did not call his ex-wife at the evidentiary hearing or offer his medical records into evidence. To satisfy the prejudice requirement of Strickland when alleging that counsel was ineffective for failing to offer testimony from a favorable witness, the post-conviction petitioner must "(1) produce the witness at his post-conviction hearing; (2) show that through reasonable investigation, trial counsel could have located the witness; and (3) elicit both favorable and material testimony from the witness." Denton v. State, 945 S.W.2d 793, 802-03 (Tenn. Crim. App. 1996) (citing Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)). Without such, the post-conviction court was unable to evaluate whether the failure to offer the same was prejudicial to the petitioner.

In any event, the petitioner has also failed to prove that offering evidence of his impotence would have changed the outcome of the case. The petitioner was convicted of rape of a child, which is defined as the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a) (2006). "Sexual penetration" is "sexual intercourse, . . . or any other intrusion, however slight, of any part

of a person's body or of any object into the genital or anal openings of the victim's . . . body, but emission of semen is not required[.]" Id. § 39-13-501(7). Even if the petitioner is in fact impotent, that does not mean that he cannot be guilty of rape of a child. See State v. Goodwin, 909 S.W.2d 35, 44-45 (Tenn. Crim. App. 1995) ("[I]mpotence is not a defense to attempted rape. The fact that the Defendant was not able to perform penile penetration does not mean that he could not be guilty of attempted rape or even rape."); see also State v. Bowles, 52 S.W.3d 69, 74 (Tenn. 2001) (victim's testimony that the defendant pressed his penis against her vulva with his hand and was only prevented from full penetration by his failure to achieve an erection was sufficient evidence of penetration to sustain conviction for aggravated rape). Here, the jury was presented with the petitioner's statement to an investigator in which he denied achieving full penile penetration, and the jury still convicted him of rape of a child. The petitioner has failed to prove that evidence of his impotence would have changed the jury's verdict against him.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.


_____
ALAN E. GLENN, JUDGE